**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **MACK INDUSTRIES LTD.,** *et al.*, | ) | **Bankruptcy No. 17-09308** |
| | ) | |
| **Debtors.** | ) | **Judge Carol A. Doyle** |
| ———————————————— | ) | |
| | ) | |
| **ARIANE HOLTSCHLAG, as Chapter 7** | ) | |
| **Trustee for Mack Industries II LLC,** *et al.*, | ) | |
| | ) | |
| **Plaintiff-Appellants,** | ) | |
| | ) | |
| **v.** | ) | **No.  22 C 606** |
| | ) | |
| **COLONY AMERICAN FINANCE LENDER** | ) | **Judge Rebecca R. Pallmeyer** |
| **LLC, CAF REO-1 LLC, and Mack LOC I LLC,** | ) | |
| | ) | |
| **Defendant-Appellees.** | ) | |
| ———————————————— | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Ariane Holtschlag[1] is the Chapter 7 Trustee for three debtors: Mack Industries II LLC ("Mack II"), Mack Industries V LLC ("Mack V"), and Mack Industries VI LLC ("Mack VI") (collectively, "Transferring Debtors").   All three of these entities are subsidiaries of Mack Industries, Ltd. ("Mack"), which is also in bankruptcy.  The Trustee brought this action against a corporate lender, Colony American Finance Lender LLC n/k/a CoreVest American Finance Lender ("Colony"), and two of Colony's subsidiaries—CAF REO-1 LLC ("CAF"), and Mack LOC I LLC ("LOC I")—challenging certain transfers of real property from the Transferring Debtors to LOC I as fraudulent. The Trustee seeks to recover from Colony the value of the purported fraudulent transfers under Section 550(a) of the Bankruptcy Code or, in the alternative, under a veil-piercing theory that LOC I (and its intermediate parent CAF) are alter-egos of Colony.  The

———————————

[1]        The previous trustee was Ronald Peterson.  Ariane Holtschlag was appointed the new trustee in the Transferring Debtors' bankruptcy cases.  (*See* Appointment of Ariane Holtschlag as Trustee [1846], *In re Mack Indus., Ltd.*, No. 17 BR 9308 (Bankr. N.D. Ill. Nov. 23, 2021).)  Prior filings contain Mr. Peterson's name.

bankruptcy court dismissed Holtschlag's complaint against Colony and CAF and entered a final and appealable judgment in these Defendants' favor. For the reasons explained here, the bankruptcy court's ruling is affirmed.

## **BACKGROUND**

### I.    **Factual Background**

The following alleged facts are drawn from the Trustee's second amended complaint. (Trustee's Second Am. Compl. ("SAC"), Bankruptcy Record [9-2] ( "Bankr. R.") at 258–306.) Mack Industries was founded in 1998 and owned by James K. McClelland. (*Id.* ¶¶ 6–7.) One of Mack's lines of business was to acquire distressed real estate, rehab it, and then sell or rent it to generate income. (*Id.* ¶ 8.)

In connection with this business, Mack obtained loans from FirstMerit Bank N.A. ("FirstMerit"), secured by mortgages on real property. (*Id.* ¶ 25.) By 2012, Mack was in default on these loans; Mack had failed to pay real-estate taxes on the properties, as required by the loan terms, and did not cure the default after being notified. (*Id.* ¶ 26.) On August 23, 2012, FirstMerit filed a 130-count lawsuit against Mack and James McClelland seeking more than $7.2 million on 65 promissory notes and associated guarantees. (*Id.* ¶ 24.)

In December 2012, while the FirstMerit litigation was ongoing, Mack entered a Master Lease Agreement with American Residential Leasing Company LLC ("AR"). (*Id.* ¶ 14.) Under this agreement, Mack leased several hundred residential properties from AR that were then subleased to residential tenants. (*Id.* ¶¶ 15, 17.) Mack was obligated to maintain the leased properties, pay AR rental fees, and pay all property taxes for the leased properties. (*Id.* ¶ 17.) Between December 2012 and January 2014, Mack and AR amended this agreement twenty times, adding additional properties to the portfolio. (*Id.* ¶ 16.)

On January 17, 2013, FirstMerit filed an amended complaint against Mack adding foreclosure counts on the properties that secured the FirstMerit loan. (*Id.* ¶ 27.) Mack was able to avoid foreclosure, however, by selling the collateral and other properties owned by McClelland-

affiliated business entities to AR in March 2013. (*Id.* ¶ 28.) After the sale, these properties were added to the Master Lease Agreement between AR and Mack, and Mack managed the properties under the Agreement. (*Id.* ¶ 29.) In light of Mack's loss of ownership over these properties, and its past inability to pay the real estate taxes on the properties, it was clear that the McClellands would face difficulty performing on the American Residential agreement. (*Id.* ¶¶ 30–31.)

Indeed, by the summer of 2014, Mack informed AR that it was incapable of meeting its obligations under the Master Lease Agreement and asked AR to renegotiate the Agreement's terms. (*Id.* ¶¶ 34–35.) During the ensuing negotiations, the Trustee alleges, representatives of Mack made statements revealing an intent to engage in fraudulent conduct if AR did not agree to Mack's proposed renegotiation terms.[2] (*Id.* ¶ 37.) Mack and AR were unable to agree on a modification to the Master Lease Agreement. (*Id.* ¶ 40.) By September 2014, Mack had stopped making its monthly rental payments to AR and stopped paying property taxes on AR's property as required under the Master Lease Agreement. (*Id.* ¶¶ 42, 43.) AR estimates that Mack owes more than $4.7 million in unpaid rent and $6.5 million in property taxes. (*Id.*) After June 2014, Mack also stopped providing AR with quarterly income statements—another violation of the Master Lease Agreement. (*Id.* ¶ 64.) On December 2, 2014, AR sent Mack a notice of default. (*Id.* ¶ 44.) On March 21, 2016, AR filed a complaint against Mack in Illinois state court for injunctive relief against Mack's conduct, damages for breach of the Master Lease Agreement, and entry of an order of prejudgment attachment to prevent Mack from further dissipating its

---

[2] The Trustee specifically alleges that Mack's Vice President of Sales and Marketing, Eric Workman, threatened that unless AR agreed to a modification of the Master Lease Agreement's terms, Mack would dissipate its assets in order to hinder AR's ability to exercise legal remedies as a creditor. (SAC ¶ 38.) The Trustee also alleges that Workman informed AR's Senior Vice President of Investments, Christoper J. Bryce, that Mack's "special relationships with relevant authorities in Cook County and surrounding areas" would "prevent [AR] from exercising management and control over its properties." (*Id.* ¶ 39.) Presumably this means that Mack threatened to use its local political connections to undermine AR, though the complaint does not make this fully clear.

assets. (*Id.* ¶ 72; *see* Compl. for Inj. and Other Relief [1], *Am. Residential Leasing Co., LLC v. Mack Indus., Ltd.*, No. 2016-CH-03970 (Ill. Cir. Ct. Mar. 21, 2016).)

The Trustee alleges that between 2013 and 2017, the McClelland family made good on their threat by engaging in a systematic scheme to shield Mack's assets from AR and other creditors. This scheme included drawing down Mack's assets to pay the McClelland family's personal expenses and obligations, as well as funneling Mack's business and assets into a number of newly created business entities—some owned by Mack itself, and others by the family directly. (*Id.* ¶¶ 54–62, 76–83.) Through these actions, the McClellands were able to extract at least $10.7 million from Mack and its related companies, even as they claimed Mack could not satisfy its obligations to AR. (*Id.* ¶ 61.) Of particular importance here, the Trustee claims that the McClellands caused Mack to transfer real estate to these other affiliated entities—including the Transferring Debtors at issue in this case—during this period. (*Id.* ¶ 76(h).)

Throughout 2013 and into 2014, the McClelland family formed nineteen new business entities, including the three Transferring Debtors Mack II (created on February 28, 2013), Mack V (created on November 21, 2013), and Mack VI (created April 30, 2014). (*Id.* ¶¶ 50–51.) Mack was the sole owner of these entities. (*Id.* ¶ 51.) The Trustee alleges that Mack caused the Transferring Debtors to acquire hundreds of properties to renovate and resell. (*Id.* ¶ 56.) It is unclear as to when, with what funds, and from whom, these acquisitions took place. Although Mack itself owned some real estate after 2013, the Trustee alleges that most of the real estate acquired in and after 2013 was acquired by the Transferring Debtors and not by Mack. (*Id.* ¶ 55.) The Trustee alleges that the McClellands acquired real estate in the name of the new business entities and transferred real estate owned by Mack to these new entities, including the Transferring Debtors, thereby reducing the assets that could be collected by AR and Mack's other creditors. (*Id.* ¶ 57.)

On November 24, 2015, almost a year after AR sent Mack a notice of default under the Master Lease Agreement, the McClellands organized Mack LOC I LLC ("LOC I"). (*Id.* ¶ 97.)

4

Unlike the Transferring Debtors, LOC I was owned by James McClelland individually (not by Mack) through an intermediate entity, Mack LOC III LLC ("LOC III")—presumably organized at some point after LOC I, though the complaint does not make this clear. (*Id.* ¶ 99.) LOC I, like the other McClelland-affiliated entities, was engaged in real-estate transactions. On or around December 29, 2015, LOC I entered into a revolving loan agreement with yet another lender, Colony American Finance, in which Colony provided funds for LOC I to acquire and renovate real estate, in an amount up to $15 million (later increased to $30 million). (*Id.* ¶¶ 103–04.) This loan was secured by a lien on LOC III's ownership interest in LOC I and by real estate acquired by LOC I. (*Id.* ¶¶ 105–06.)

In eight transactions between April and October 2016, the three Transferring Debtors transferred a total of 169 properties to LOC I: 152 properties from Mack II, 14 from Mack V, and three from Mack VI. (*Id.* ¶¶ 108, 115.) The Transferring Debtors held an average of 30% equity in the transferred properties that were encumbered by preexisting mortgages, while others had no prior valid mortgages and had their entire value transferred to LOC I. (*Id.* ¶¶ 111–12.) For each of these eight transactions, Colony (a) advanced a portion of the revolving $30 million loan, (b) agreed that prior mortgages on the properties would be paid and released (presumably by LOC I using the advanced funds, though the complaint does not make this clear), and (c) took back mortgages on the properties transferred to LOC I by the Transferring Debtors as security for the loans. (*Id.* ¶ 115.)

In her complaint, the Trustee alleges that Colony purposefully structured these transactions to prevent anyone else, including Mack's and the Transferring Debtors' creditors, from seizing the assets at issue. (*Id.* ¶ 101.) The transactions would not have occurred, she claims, if Colony had not advanced a portion of the loan amount, helped pay off the mortgages, and taken on new ones. (*Id.* ¶ 116.) She contends, further, that the Transferring Debtors did not receive any value in exchange for transferring the property to LOC I and were insolvent when they made the transfers. (*Id.* ¶¶ 161–62.) According to the complaint, Colony "received far more

5

than it gave" through the transaction (*id.* ¶ 131), in that it took out mortgages on the collateral and also "effectively locked up the equity in the properties" through its lien on LOC III's membership interest in LOC I, giving it "collateral far in excess of the funds it advanced" (*id.* ¶ 129). Thus, the Trustee argues, the transfers were made to the Transferring Debtors' detriment and for both LOC I's and Colony's benefit. (*Id.* ¶¶ 132–35.)

Like the other McClelland affiliates, LOC I failed to pay its debts when due. By January 2017, it had defaulted on its loan with Colony. (*Id.* ¶ 136.) Colony declared the default, but rather than foreclosing on its mortgages for LOC I's properties, it chose to hold a public UCC Article 9 sale of LOC III's membership interest in LOC I. (*Id.* ¶¶ 138–41.) At the March 6, 2017 sale, Colony credit-bid a portion of the outstanding balance of its loan with LOC I to acquire that membership interest. (*Id.* ¶ 140.) Colony then transferred that membership interest to its own wholly owned special-purpose entity CAF REO-1 LLC. (*Id.* ¶ 141.) By means of this procedure, Colony acquired LOC I from the McClellands and assumed indirect control over its operations through CAF. (*Id.* ¶ 142.)

Once in control, Colony caused LOC I to sell 136 of its properties from May through December of 2017, and used the proceeds from these sales to satisfy its loan. (*Id.* ¶¶ 143–44.) The total sale price for these 136 properties was $12,843,250, though "months earlier," the Trustee alleges (without providing specifics), Colony had valued these properties at $24,704,000. (*Id.* ¶ 145.)

According to the Trustee, Colony was aware of the McClellands' scheme to defraud Mack's and the Transferring Debtors' creditors before it became the sole owner of LOC I, because Colony was able to access and inspect the properties prior to the UCC sale. (*Id.* ¶ 149.) These inspections, which took place between February and March of 2017, revealed that the McClellands, acting through Mack and LOC I, had removed goods and property from LOC I property, had submitted false sworn contractor statements, and had improperly requested and obtained advances for renovation work that was never or only partially completed. (*Id.* ¶¶ 149–

50.)  Despite its knowledge of the McClellands' improper activities, the Trustee alleges, Colony took no steps to provide notice of the wrongdoing to other creditors.  (*Id.* ¶ 151.)  Colony itself now alleges that Mack and the McClellands engaged in fraud, including by submitting false statements to obtain additional funds for renovation work on the properties.  (*Id.* ¶¶ 93–94.) Colony has asserted its own claims in Mack's bankruptcy case for conversion, misappropriation of funds, fraud, aiding and abetting fraud, conspiracy to defraud, and fraudulent transfer.  (*Id.* ¶ 148.)

## II.    Procedural Background

On March 24, 2017, Mack filed for bankruptcy.  (*Id.* ¶ 69.)  At that time, it had assets of $56.4 million and liabilities of $71.2 million.  (*Id.*)  Mack II filed for bankruptcy a few months later (*id.* ¶ 163), and Mack V and Mack VI followed suit in February 2018  (*id.* ¶¶ 165, 167).  The Trustee was appointed to oversee Mack's bankruptcy, and later assigned to jointly administer the bankruptcies of its related entities.  (Compl. [Bankr. R. 78–90] ¶¶ 7–10.)  In that role, the Trustee filed some four hundred adversary complaints seeking to recover Mack's (and its affiliates') allegedly fraudulent or preferential transfers made prior to bankruptcy.  *Peterson v. Colony Am. Fin. Lender LLC*, 634 B.R. 1010, 1014 (Bankr. N.D. Ill. 2021).  That included this proceeding, which the Trustee filed on March 23, 2019 on behalf of the three Transferring Debtors—Mack II, Mack V, and Mack VI—against LOC I, its new grandparent Colony, and its parent CAF.  Months later, in an amended complaint, the Trustee asserted (1) a claim to avoid and recover from LOC I and Colony the value of the transfers made by the Transferring Debtors to LOC I as constructively fraudulent under Sections 544(b)(1), 548(a)(1)(B), and 550(a) of the Bankruptcy Code and provisions of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/5(a)(2), 6(a) and 8(a); (2) a claim to avoid and recover from LOC I and Colony the value of the transfers made by the Transferring Debtors to Colony and LOC I as actually fraudulent under Sections 544(b)(1), 548(a)(1)(A), and 550(a) of the Bankruptcy Code and provisions of the IUFTA, 740 ILCS 160/5(a)(1) and 8(a); and (3) a claim that the court should pierce the corporate veils of

7

LOC I and CAF to hold Colony directly liable for the allegedly fraudulent transfers made by the Transferring Debtors to LOC I. (Am. Compl. [Bankr. R. 116–33] ¶¶ 105–42.)

In a published opinion on March 31, 2021, Judge Carol A. Doyle of the bankruptcy court dismissed that complaint. *Peterson*, 634 B.R. at 1014. The bankruptcy court agreed with Defendants that Colony was not an "initial transferee" of the fraudulently transferred properties or an entity "for whose benefit such transfer was made" under Section 550(a)(1) of the Bankruptcy Code, and that the Trustee had failed to allege a basis for recovery under any other section of 550(a). *Id.* at 1016–19. Further, the bankruptcy court held that the Trustee's complaint failed to satisfy Rule 9(b)'s heightened pleading standard for actual fraud claims, and did not plausibly establish that the Transferring Debtors' transfers of property to LOC I were connected to Mack's alleged scheme to defraud its creditors. *Id.* at 1019–25. Finally, the bankruptcy court held that the Trustee had failed to allege sufficient facts with particularity to justify piercing the two corporate veils of LOC I and CAF to recover from Colony. *Id.* at 1025–30.

With leave of court (Bankr. R. 256–57), the Trustee filed a second amended complaint on May 3, 2021, making additional allegations in response to the bankruptcy court's dismissal order. (*See generally* SAC.) Defendants again moved to dismiss, and this time were successful only in part. *In re Mack Indus., Ltd.*, No. 17 BR 9308, 2021 WL 6015700 (Bankr. N.D. Ill. Dec. 21, 2021). The bankruptcy court found that, this time around, the Trustee had pleaded sufficient facts to make out a claim of actual fraud against *LOC I*. *Id.* at *9–11. In other words, the Trustee had met its burden at the motion-to-dismiss stage of showing how the *McClellands*' actions in moving property from the Transferring Debtors to LOC I were part of their fraudulent scheme to withhold Mack's assets from its creditors. However, the bankruptcy court adhered to its prior conclusions that Colony could not be held liable for the value of these avoided transfers under Section 550(a) as either an initial transferee, a benefitted entity, or a subsequent transferee, and that the Trustee had failed to justify piercing the two corporate veils separating LOC I from Colony. *Id.* at *3–9, 11–14.

On January 20, 2022, Judge Doyle entered final judgment dismissing the claims against Colony and CAF pursuant to Rule 54(b) of the Federal Rules of Civil Procedure ("FRCP") (as made applicable by Rule 7054(a) of the Federal Rules of Bankruptcy Procedure) and stayed further proceedings pending the outcome of any appeal. (Order Granting Def.'s Unopposed Mot. Entry Final J. on Dismissed Claims [Bankr. R. 624-25].) The bankruptcy court ruled that its December 2021 order constituted a "final adjudication of all claims" against Colony and CAF, and that because LOC I had no remaining assets, there was "no just reason to delay entry of final judgment" Colony and CAF's favor because the Trustee could recover against LOC I only if the bankruptcy court's ruling in favor of Colony and CAF were to be reversed on appeal. (*Id.*). The Trustee's appeal of that final judgment [1] is now before this court for decision.

## DISCUSSION

### I. Standard of Review

Pursuant to 28 U.S.C. § 158(a), this court has jurisdiction to hear appeals from final orders and judgments of bankruptcy courts. On appeal, this court reviews the bankruptcy court's decision to grant or deny a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure de novo. *In re Jepson*, 816 F.3d 942, 945 (7th Cir. 2016).

A motion to dismiss under Rule 12(b)(6) "challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Juza v. Wells Fargo Bank, N.A.*, 794 F. App'x 529, 531 (7th Cir. 2020) (citation omitted); *see* FED. R. CIV. P. 12(b)(6). While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, the court accepts all well-pleaded factual

allegations as true and draws all reasonable inferences in the plaintiff's favor. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021).

The Trustee's fraud allegations are governed by Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake," but allows that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). A claim that is premised upon a course of fraudulent conduct "sounds in fraud" and can implicate Rule 9(b)'s heightened pleading standards. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted). Some courts in this district have held that Rule 9(b) does not apply to veil-piercing claims as a general matter, but there is a recognized exception in cases where the court is asked to pierce the corporate veil to establish liability for fraud. *Superkite PTY, Ltd. v. Glickman*, No. 12 C 7754, 2014 WL 1202577, at *3 (N.D. Ill. Mar. 21, 2014) (collecting cases). The Trustee's alter–ego veil-piercing claims are based on allegations of fraudulent conduct; therefore, Rule 9(b) is the appropriate pleading standard for her fraud claims.[3]

## II. Summary of Issues on Appeal

The key question before this court is not whether the Trustee has stated a sufficient claim to avoid the transfers from the Transferring Debtors to Defendant LOC I as actually fraudulent. The bankruptcy court already found that she has, and Defendants have not appealed that ruling. *See In re Mack*, 2021 WL 6015700, at *9. The question, rather, is whether the Trustee can recover the value of these transfers from the other two Defendants in this case, LOC I's new ultimate owner Colony and its intermediate subsidiary CAF.

On appeal, the Trustee argues that her allegations are adequate to support claims against Colony and CAF under two principal theories: first, that Colony and CAF are liable for the fraudulent transfers made by the Transferring Debtors to LOC I under the doctrine of piercing the

---

[3] The Trustee did not challenge the bankruptcy court's application of Rule 9(b) on appeal, so the court will not discuss this issue further.

corporate veil, and second, that Colony is liable under Section 550(a)(1) of the Bankruptcy Code as an "entity for whose benefit" the transfers were made. (Brief of Appellant Trustee in Support of Appeal from Order of the United States Bankruptcy Court ("Trustee's Brief") at 14–16.) The Trustee also argues in the alternative that, if the court finds Colony not liable as a benefiting entity, her allegations are sufficient to hold Colony liable as an "immediate or mediate" transferee (also known as a "subsequent transferee") under Section 550(a)(2) of the Code. The Trustee contends that the bankruptcy court's decisions to the contrary disregarded her allegations, drew inferences in Defendants' favor, and applied incorrect legal standards for what constitutes an entity for whose benefit a transfer is made. (*Id.* at 20, 24–27, 32–34.)

The issues on appeal, are therefore (1) whether the bankruptcy court properly dismissed the Trustee's claim to hold Colony liable for the alleged fraudulent transfers made by the Transferring Debtors to LOC I by piercing the corporate veils of LOC I and CAF; (2) whether the bankruptcy court properly dismissed the Trustee's claims to recover from Colony as an entity for whose benefit the alleged fraudulent transfers were made; and (3) whether the bankruptcy court was correct in concluding that the Trustee failed to plead that Colony was an immediate or mediate transferee of the alleged fraudulent transfers. The court addresses those issues in turn.

## III. The bankruptcy court properly dismissed the Trustee's claim to pierce the corporate veils of LOC I and CAF to recover from Colony.

The Trustee first contends that she has successfully stated a claim that Colony is liable for any avoided fraudulent transfers to its second-tier subsidiary LOC I since there is no legal distinction between them. (Trustee's Brief at 15.) Delaware law[4] permits a court to pierce the corporate veil "only in the exceptional case." *Eagle Air Transp., Inc. v. Nat'l Aerotech Aviation*

---

[4]     Defendants are Delaware limited liability companies, and the law of the state of incorporation applies to claims to pierce the corporate veil. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012). The parties agree that Delaware law applies to this issue. (Trustee's Brief at 16; Brief of Appellee Defendants in Support of Appeal from Order of the United States Bankruptcy Court ("Defendants' Brief") at 7.)

*Del., Inc.*, 75 F. Supp. 3d 883, 896 (N.D. Ill. 2014) (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, Civ. A. No. 3088-VCP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008)).  To proceed under an alter-ego veil piercing theory, a plaintiff must show that a parent and subsidiary "operate[ ] as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them."  *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, Civ. A. No. 2022-0378-LWW, 2023 WL 5688392, at *5 (Del. Ch. Sept. 5, 2023) (quoting *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 707 (Del. Ch. 2021)).  Piercing the corporate veil "requires that the corporate structure cause fraud or similar injustice."  *Id.* (citation omitted).

Some courts have strictly held that the veil-piercing standard requires proving that the corporation is a "sham entity designed to defraud investors and creditors," *Eagle Air Transp.*, 75 F. Supp. 3d at 896 (citation omitted), but others have more flexibly allowed for veil-piercing without a showing of actual fraud if the plaintiff can show "a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness," *NetJets Aviation, Inc. v. LHC Comm'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (citation and internal quotation marks omitted).[5] The fraud or injustice must, however, "come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim."  *Cleveland-Cliffs*, 2023 WL 5688392, at *6 (citation omitted).

Delaware courts consider a number of factors to decide whether piercing the corporate veil is proper: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company

---

[5]    Defendants correctly argue that the Second Circuit's *NetJets* opinion is not binding in this circuit, but this court has chosen to apply the *NetJets* standard in the past.  *See, e.g.*, *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, 33 F. Supp. 3d 947, 972 (N.D. Ill. 2014).  The Trustee relies almost exclusively on the *NetJets* opinion in her brief.  The court need not decide which (if any) of these standards is controlling; as discussed further below, the Trustee's claim would fail even under *NetJets*.

simply functioned as a facade for the dominant shareholder." *Cleveland-Cliffs*, 2023 WL 5688392, at *5 (quoting *Manichaean*, 251 A.3d at 706); *NetJets*, 357 F.3d at 176–77. None of these factors are determinative, but there must always be an "an overall element of injustice or unfairness." *Manichaean*, 251 A.3d at 706–07 (citation omitted).

Here, the Trustee seeks to pierce not just one corporate veil, but two: the veil separating CAF from LOC I, and the veil between Colony and CAF. She has alleged that Colony assumed indirect control of LOC I from the McClellands after acquiring LOC I's membership interests through a UCC sale and transferring the interests to its wholly owned subsidiary CAF. (SAC ¶ 140). Mere ownership and control, however, are not by themselves sufficient to support piercing the corporate veil. *Wenske v. Blue Bell Creameries, Inc.*, Civ. A. No. 17-0699, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) (holding that a complaint did not allege sufficient facts required to pierce the corporate veil when the plaintiff alleged 100% ownership of a subsidiary by parent, overlapping officers, and management of the subsidiary by the parent); *MicroStrategy Inc. v. Acacia Rsch. Corp.*, Civ. A. No. 5735-VCP, 2010 WL 5550455, at *11–12 (Del. Ch. Dec. 30, 2010) ("[A] plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence.").

The Trustee urges that she has met this test; she has gone beyond allegations of ownership and control by alleging that LOC I was also undercapitalized. She alleges that by causing LOC I to sell its parcels of land, Colony rendered LOC insolvent. (Trustee's Brief at 19; SAC ¶ 202). As the bankruptcy court noted, the Trustee has not identified the "undertaking" for which LOC I was undercapitalized, but the bankruptcy court assumed, as this court does, that the Trustee was referring to the obligation to pay off the secured loan to Colony—a debt that was only partially satisfied when Colony acquired LOC I and liquidated its assets.[6] But as the Trustee

---

[6]    It is also possible that the Trustee thinks that LOC I was inadequately capitalized for the undertaking the *McClelland family* attempted at the time of LOC I's creation—but this would have no bearing on Colony's liability.[7]    The language of the Trustee's complaint suggests that Colony knew about Mack's financial troubles and sought to get out ahead of its other creditors

herself recognizes, LOC I had defaulted on the loan and was already "insolvent" under at least one definition recognized under Delaware law by the time Colony acquired its membership interests, in that it was unable "to meet maturing obligations as they fall due in the ordinary course of business." (SAC ¶ 136.) *Manichaean*, 251 A.3d at 707. That LOC I was "mere[ly] insolven[t]" prior to Colony's acquisition and upon sale of the property in partial satisfaction of its debt is "not enough to allow piercing of the corporate veil." *Mason v. Network of Wilmington, Inc.*, Civ. A. No. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005). Rather, what matters is whether Colony abused the corporate form by rendering its subsidiary insolvent in a way that "unjustly shield[ed] its assets from its creditors." *Id.*

In this case, Colony itself was a creditor, and caused its acquired subsidiary to engage in an arm's length transaction (the sale of properties) to raise funds sufficient to pay off its debt to Colony. (SAC ¶ 143.) Contrary to her insistence, the Trustee has not adequately alleged that Colony and CAF rendered LOC I undercapitalized in a way that would support piercing the corporate veil of LOC I and CAF to recover from Colony. Colony's actions in its capacity as a secured creditor to acquire LOC I and liquidate its assets in satisfaction of its debt are different from "undercapitalization" as it is commonly understood in the veil-piercing context—i.e., a situation in which owners operate a company on an ongoing basis with "so little money that it cannot operate its business on its own," meaning that "there is no basis for rewarding them by limiting their liability" since "doing so would only encourage risky behavior." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 612 (7th Cir. 2009) (applying Illinois law).

The Trustee's argument that Colony did not observe corporate formalities (Trustee's Brief at 19) has slightly more purchase, but cannot carry the day in her favor. The Trustee notes that

---

by "structur[ing] these transactions . . . [so] that no one else . . . could seize the assets at issue." (SAC ¶ 101.) But there are no specific allegations beyond this conclusory language that Colony actually had this knowledge at the time of the loan transaction—and even if it did, the court is not convinced this would make a difference in proving that its conduct in this regard was fraudulent or inequitable.

Colony did not allow CAF and LOC I to appoint independent officers, that Colony executed property sales documents on LOC I's behalf, and that Colony took direct control of LOC I's assets. (Trustee's Brief at 19, 21; SAC ¶¶ 204–05, 275.) These allegations do present at least some indicia that LOC I and CAF were not meaningfully separate and independent from Colony. But there is no mention of other circumstances that would support this factor—for instance, that LOC I and CAF failed to maintain accurate financial records, that they did not timely and properly file tax returns, that both entities used the same bank accounts, or that there were no meetings or articles of organization. *Cf. Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, 33 F. Supp. 3d 947, 973 (N.D. Ill. 2014) (finding that a plaintiff had established "failure to observe corporate formalities" by alleging that defendant corporation failed to maintain corporate records, to file timely tax returns, to obtain board approval for its transactions, and to keep minutes or articles of organization). And although the Trustee also characterizes Colony's alleged failure to give notice to LOC's other creditors as a breakdown of "corporate formalities," she cites no authority showing that Colony had any such obligation as a matter of Delaware corporate form. In any event, the corporate-formalities factor is rarely determinative on its own—particularly in the LLC context, where fewer such formalities are required. *NetJets*, 537 F.3d at 178.

Nor has the Trustee supported her argument that Colony siphoned funds from LOC I. As the court reads her assertions on this score, they are largely speculative: that Colony *could* have sold the property for more than it did or *could* have foreclosed on properties instead of acquiring LOC III's membership interests in LOC I. (Trustee's Brief at 19–20; SAC ¶¶ 138, 196–98.) Colony exercised its control over LOC I to liquidate its assets in satisfaction of its antecedent loan, but taking such an action as a secured creditor is quite different form the kind of "siphoning" that courts have found sufficient to support a veil-piercing claim.

The *NetJets* case cited by the Trustee illustrates this point. In that case, the plaintiff alleged that an owner of an LLC unfairly disregarded the rights of the LLC's creditors by mischaracterizing his withdrawals as loans, purchasing a luxury vehicle almost equal in value to

the LLC's outstanding debt and then transferring title to himself, withdrawing funds from the LLC just one day after their receipt from the LLC's sole client, and withdrawing more money than he ever invested in the organization. *NetJets*, 537 F.3d at 183–84. As Bankruptcy Judge Doyle observed, this case differs. *Peterson*, 634 B.R. at 1030 n.13. Unlike the owner in *NetJets*, Colony used funds from the sale of assets not to pay for personal expenses, but to pay down loans it had extended to LOC I under an earlier secured agreement. (SAC ¶ 143.) The *NetJets* court cited the Delaware Chancery Court's earlier opinion in *Harco National Insurance Co. v. Green Farms. Inc.*, which held that "the plaintiffs must also show that such transfers were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans." Civ. A. No. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989). The Trustee has not made such a showing here.

Ultimately, the critical question in the veil-piercing inquiry is whether the plaintiff has shown there was an element of fraud, injustice or unfairness in the defendant's use of the challenged corporate form. *NetJets*, 537 F.3d at 177 (citing *Harco*, 1989 WL 110537, at *5). The Trustee believes that she has done so, in alleging that Colony structured its loan transactions with LOC I to "lock[] up the equity in the properties" that LOC I offered as collateral. (SAC ¶ 129.) But those transactions occurred *before* LOC I defaulted and Colony took it over, and as the bankruptcy court correctly noted, there is nothing inherently inequitable about creating and using subsidiary companies to hold (or liquidate) collateral for a loan. *In re Mack*, 2021 WL 6015700, at *13. Colony was within its rights to structure its loan transaction in a way that gave itself maximal security for the risk it was undertaking, and the Trustee has not offered a basis for concluding that Colony's conduct rose above some proscribed level of unfairness.[7]

---

[7] The language of the Trustee's complaint suggests that Colony knew about Mack's financial troubles and sought to get out ahead of its other creditors by "structur[ing] these transactions . . . [so] that no one else . . . could seize the assets at issue." (SAC ¶ 101.) But there are no specific allegations beyond this conclusory language that Colony actually had this knowledge at the time of the loan transaction—and even if it did, the court is not convinced this would make a difference in proving that its conduct in this regard was fraudulent or inequitable.

In her effort to make such a showing, the Trustee emphasizes that Colony caused LOC I to quickly sell its assets below fair market value in bulk sales, to the detriment of LOC I's other creditors. (Trustee's Brief at 22–23; SAC ¶¶ 138–39, 199–200.)[8] She asserts that Colony was aware of the existence of these other creditors before and while its collateral was being liquidated (SAC ¶¶ 148, 203)—but she presents no specifics about their rights to collect, the nature of their claims or (most importantly) how any such claims were superior to Colony's own right to liquidate collateral in partial fulfillment of the debt LOC I owed to Colony.[9] The bankruptcy court twice found that this was not enough to support a reasonable inference of injustice or fraud: as a first lien holder, Colony had a right to liquidate LOC I's collateral to satisfy its loan default, and the Trustee's

_____

[8]    The Trustee also alleges that Colony "caused LOC I's status with the Illinois Secretary of State to be changed to 'revoked' as of May 11, 2018." (SAC ¶ 146.) How this relates to a showing of injustice is not clear to the court; as the bankruptcy court noted, under Illinois law, a foreign LLC's authority to transact business in Illinois may be revoked by the Secretary of State if that company fails to perform ministerial acts like paying a fee and filing an annual report. (Statement of Bankruptcy Ct. on Granting Mot. to Dismiss Trustee's Am. Compl. [Bankr. R. 225–246] at 20.) In any event, according to the Trustee's version of events, this revocation occurred nearly a year after the LOC I assets had been sold. (SAC ¶ 146.)

[9]    In support of her allegations that Colony had actual knowledge of LOC I's other creditors, the Trustee points to a series of letters exchanged between AR's counsel and Colony's counsel in May 2017, when Colony was in the process of selling off LOC I's collateral. (Bankr. R. 465–67.) These letters were only discovered after the Trustee filed her most recent complaint, so they are not within the scope of the pleadings. Although the Trustee attached them to her response papers before the bankruptcy court, and requested leave to amend her complaint to add them in the event that Defendants' motion to dismiss was granted (*id.* at 455), the bankruptcy court correctly concluded that they would not affect the ultimate analysis even if they could be considered for purposes of the motion to dismiss. *In re Mack Indus.*, 2021 WL 6015700, at *10. The letters show that AR's counsel notified Colony of its and others' competing claims against Mack and requested that Colony cease liquidating LOC I's property because, AR warned, that property was "potentially subject to the authority of the Chapter 11 trustee appointed in this case for the benefit of the estate." (*Id.* at 465.) Colony responded that (1) the collateral came from Mack's subsidiaries (which had not themselves declared bankruptcy at that point) and not Mack itself, (2) the collateral was subject to valid Colony mortgages that were unaffected by the Mack bankruptcy, and (3) that Colony intended to exercise its rights in these mortgages as a secured creditor. (*Id.* at 466.) At most, these letters show that Colony was put on notice of a hypothetical conflict between its claims to LOC I's collateral and Mack's creditors' claims *after* it had already completed the loan transactions, acquired LOC I following its default, and begun the liquidation process. Even drawing all inferences in the Trustee's favor, this does not plausibly show that Colony intended to defraud or unfairly disadvantage AR or others.

allegations do not show how exercise of that right was inequitable under the circumstances. *Peterson*, 634 B.R. at 1028; *In re Mack*, 2021 WL 6015700, at *13. Colony has supplied none of this missing information on appeal. The Trustee is entitled to have inferences drawn in her favor, but those inferences must be supported by factual allegations, which are absent here. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

As the Trustee sees things, Colony must have intended harm to other creditors as that was the "natural consequence" of its actions. (Trustee's Brief at 22–23.) The Trustee cites to one case, *In re Sentinel Management Group*, 728 F.3d 660, 667 (7th Cir. 2013), in support of her position that intent to harm can be inferred from the consequences of an action. *In re Sentinel*, however, did not involve a veil-piercing claim at all. Rather, in that case, Sentinel Management Group was responsible for managing funds for the benefits of its client-investors. Those funds were to remain segregated, but Sentinel unlawfully transferred some of the funds to other accounts and then used that money to secure a loan from the Bank of New York, permanently depriving its clients of those funds. *Id.* at 662. After Sentinel could no longer satisfy the loan and filed for bankruptcy, the trustee for Sentinel filed an adversary proceeding against the Bank of New York—Sentinel's only secured creditor—seeking to avoid the Bank's lien against Sentinel's assets under Section 548(a)(1)(A) of the Bankruptcy Code and to equitably subordinate the Bank's secured claim to those of Sentinel's unsecured creditors. *Id.* at 666. The district court ruled in the Bank's favor, finding that the trustee had "failed to prove that Sentinel made the Transfers with the actual intent to hinder, delay, or defraud its creditors." *Id.* at 666 (quoting *Grede v. Bank of N.Y. Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010)). The Seventh Circuit reversed, however, concluding that although Sentinel did not intend to harm its clients by rendering the funds permanently unavailable, it should have known that such an unlawful transfer of the segregated funds exposed its clients to this risk. *Id.* at 667. This was sufficient, in the court's view, to support a finding that Sentinel acted "with actual intent to hinder, delay, or defraud" and that the trustee could therefore avoid Sentinel's transfers to the Bank under Section 548(a)(1)(A).

*Id.* Here, in contrast, the Trustee is not attempting to avoid Colony's lien to LOC I under Section 548, but rather seeking to hold it liable under a veil-piercing theory for an avoided fraudulent transfer to LOC I as its subsidiary—and the Trustee has not shown why *In re Sentinel*'s holding is applicable in this context. Moreover, Colony exercised its rights as a secured lender *before* the Transferring Debtors filed for bankruptcy, whereas the bank lender in *In re Sentinel* filed a claim in the context of Sentinel's Chapter 11 bankruptcy.

The Trustee speculates that LOC I's other unsecured creditors could have been paid if the Defendants had instead waited to sell the 136 properties individually and "properly" marketed them. (Trustee's Brief at 26; SAC ¶¶ 197, 200.) Whatever the factual merit of this theory, it does not support a plausible inference that any such other creditors (to the extent they could even have asserted valid claims against LOC I and not Mack) were defrauded by the use of the corporate form, or that any injustice has occurred. *Cf. Harco*, 1989 WL 110537, at *4 ("[T]he corporate veil may be pierced in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation require it, are involved.") (citation omitted). The risk that some unspecified creditors may not be able to recover from LOC I is not the type of "injustice" contemplated under Delaware veil-piercing law. *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) (noting that the risk that a plaintiff "may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil"); *see also Mason*, 2005 WL 1653954, at *3 ("If creditors could enter judgments against shareholders every time a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless.").

The Seventh Circuit's opinion in *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), is instructive in this regard. In *Sea-Land*, the plaintiff sought to recover payments it was owed for services by piercing the corporate veil of its contractual party to recover from its owner. *Id.* at 520. Applying Illinois law, the Seventh Circuit explained for that for purposes of the "injustice" prong of the veil-piercing inquiry, there must be more than a showing that a judgment

will be unsatisfied. *Id.* at 522–23. An unsatisfied judgment looms in every veil-piercing action, the court observed, because the plaintiff will only bring such an action when there are insufficient assets in the hands of the debtor. *Id.* Thus, if an "unsatisfied judgment is enough for the 'promote injustice' feature of the test, then every plaintiff will pass on that score" and the two-pronged test would collapse into a sole "unity of interest and ownership" test. *Id.* In this case, the bankruptcy court properly found no basis for inferring that anything unjust, fraudulent, or inequitable occurred when Colony exercised its rights as a first-position lien holder by causing LOC I to liquidate its assets and pay down its loan.

In reaching this conclusion, the bankruptcy court did not disregard the Trustee's well-pleaded allegations or draw inferences in the Defendants' favor. Instead, the bankruptcy court held that the Trustee's nonconclusory allegations were insufficient to overcome the reasonable inference that what happened here is nothing more than a standard secured lending agreement and an exercise of rights by a first position lien holder. This court agrees.

## IV. The bankruptcy court properly dismissed the Trustee's claim to recover fraudulent transfers from Colony as an "entity for whose benefit such transfers were made."

In addition to her veil-piercing argument, the Trustee contends she is entitled to recover the value of LOC I's fraudulent transfers directly from Colony as a qualifying entity under the categories of Section 550(a) of the Bankruptcy Code. Section 550 provides:

(a)    [T]o the extent that a transfer is avoided under section[s] 544 . . . [or] 548, . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b)    The trustee may not recover under section [1] (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550. Even if a transfer is avoided as fraudulent under Sections 544 or 548, it can only be recovered from an entity that falls into one of Section 550(a)'s categories. *See In re Smith*, 811 F.3d 228, 244 (7th Cir. 2016). Accordingly, the Trustee argues that Colony should be considered an "entity for whose benefit" the fraudulent transfers to LOC were made under Section 550(a)(1).

The Bankruptcy Code does not define "transferee" or "entity for whose benefit such transfer was made" for purposes of Section 550(a), nor is there any useful legislative history on this issue. *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988). In *Bonded*, the Seventh Circuit determined that for purposes of Section 550(a), a "transferee" is at minimum a person who has "dominion" over money or another asset, or "the right to put the money to one's purposes." *Id*. In that case, Michael Ryan fraudulently caused a currency exchange that he controlled, Bonded Financial Services, to transfer $200,000 to his bank account. *Id*. at. 891. Ten days after Bonded had transferred the funds, Ryan instructed the bank to apply the $200,000 deposit to reduce the outstanding balance on a debt he owed the bank for his separate farm business. *Id*. A few weeks later, Bonded filed for bankruptcy, and its trustee sought to recover the $200,000 from the bank. But because the bank "received nothing from [the debtor] that it could call its own" and merely acted as Ryan's agent, the court concluded that it was not an initial transferee and not liable under Section 550(a)(1). *Id*. at 893. Instead, the bank was an "immediate or mediate" transferee under Section 550(a)(2) because it only obtained "dominion" over the funds ten days after the transfer and then used them to satisfy Ryan's debt. *Id*. at 896.

As the *Bonded* court further held, an "entity for whose benefit" a transfer is made is one who "receives the benefit [of the transfer] but not the money." *Id*. at 895. The *Bonded* court noted that the typical benefiting entity is a guarantor or debtor, who is relieved of the debt or the obligation to guarantee it on account of an initial transfer. *Id*. The court went on to explain that Section 550(a)(1) recognizes that "debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment[;] . . . that but for the payment B may have had to make

21

good on the guarantee of pay of his own debt; and accordingly that B should be treated the same way initial recipients are treated." *Id.* Guarantors or debtors are paradigmatic, but other types of parties may also be entities for whose benefit a transfer is made. *See, e.g.*, *Boyer v. Belavilas*, 474 F.3d 375, 377 (7th Cir. 2007) (no clear error in determination that custodian of a common law trust who caused that trust to transfer funds to entities that she controlled was an entity for whose benefit the transfer was made). The ultimate question is which entity or individual "receives a benefit from the initial transfer." *Bonded*, 838 F.2d at 896; *see also In re Compton Corp.*, 831 F.2d 586, 595 (5th Cir. 1987) ("The entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer."). But importantly, because of the statute's structure separating benefitting entities under 550(a)(1) from subsequent transferees under 550(a)(2), the *Bonded* court also held that these categories were mutually exclusive: "Someone who receives the money later on is not an "entity for whose benefit such a transfer was made"; only a person who receives a benefit *from* the initial transfer." *Id.* at 896 (emphasis added).

The Trustee argues here that Colony is a benefitting entity under Section 550(a)(1) because it received a benefit when the Transferring Debtors transferred real property to LOC I. As the bankruptcy court has explained, however, this theory is inconsistent with *Bonded's* teaching that subsequent transferees cannot also be benefitting entities. *Peterson*, 634 B.R. at 1018; *In re Mack*, 2021 WL 6015700, at *8. Colony never held title to the properties; they were transferred from the Transferring Debtors to LOC I. Then, once LOC I had received this title, it conveyed an interest in the properties to Colony in the form of a lien. Conveying such an interest is itself recognized as a "transfer" under the Bankruptcy Code. *See* 11 U.S.C. § 101(54). Thus, LOC—the entity with "dominion" over the properties—is most naturally understood as the "initial transferee" of the transferred property. Colony is the subsequent transferee of a lien interest in this property, and is thus not properly treated as a benefitting entity.

Attempting to find a way around *Bonded*, the Trustee relies on two Eleventh Circuit cases recognizing that a creditor may in some circumstances be a benefiting entity: *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298 (11th Cir. 2012), and *Am. Bank of Martin Co. v. Leasing Service Corp.* (*In re Air Conditioning, Inc. of Stuart*), 845 F.2d 293 (11th Cir. 1988). This court is not bound by these decisions, and, as the bankruptcy court correctly concluded, they are distinguishable.

In *TOUSA*, pre-petition lenders received a payment on a defaulted loan from a debtor who funded that payment with additional loans that were secured by liens on the assets of the debtor's subsidiaries. *TOUSA*, 680 F.3d at 1301–02. These subsidiaries owed no money to the pre-petition lenders who received the new loan proceeds, and received no benefit in exchange for granting the liens to help pay off their parent's creditors. *Id.* The trustee successfully avoided the transfer of the liens by the subsidiaries to the new lenders as fraudulent and recovered from the pre-petition lenders as benefiting entities of the transfers of liens. *Id.* at 1308. The Eleventh Circuit affirmed and ordered the lenders to disgorge the proceeds from the settlement payment. *Id.* at 1313. In doing so, the Eleventh Circuit held that a "creditor similarly situated to the [pre-petition lenders] can be an entity for whose benefit a transfer was made." *Id.*

There is no similar web of relationships in this case. Colony is not similarly situated to the pre-petition lenders in *TOUSA*: it had no loan agreement with the Transferring Debtors, nor did the Transferring Debtors (or Mack) secure any loan. Further, unlike the subsidiaries in *TOUSA* (which did not get anything out of the exchange), LOC I received loan funds from Colony in return for liens on the transferred property. Colony's status as a creditor and lender does not per se preclude it from being a benefitting entity, but *TOUSA* does not stand for the proposition that a creditor "benefits" from a transfer when it issues loan proceeds and obtains liens on the transferred property in exchange. If any party is "similarly situated" to the creditor in *TOUSA*, it is

the Transferring Debtors' pre-existing mortgage lenders that were paid off after the property was transferred to LOC I.[10]  *TOUSA*, 680 F.3d at 1313.

The Trustee characterizes the facts in *TOUSA* as akin to this case in that "a debtor gave something up to someone and a third party benefited from that Transaction."  (Trustee's Brief at 33.)  The Trustee insists that "[t]he economic substance of the transactions is that the Transferring Debtors transferred the equity in their property to LOC I and Colony or for their benefit."[11]  (SAC ¶ 130.)  But aside from the fact that Colony obtained liens in return for earlier loan advances, she has not provided a basis for the inference that Colony benefited from the Transferring Debtors' transfer of property to LOC I.  A benefiting entity receives some benefit from the initial transfer— for example, relief from liability or from a debt.  That did not happen for Colony: its liabilities did not decrease, nor did Colony receive credit against an outstanding loan.  Instead, Colony took back security interests on property in return for loans advanced to acquire such property; it gave value and received value.  Colony is a transferee of liens received after the initial transfer of title

---

[10]     The *Air Conditioning* case is similarly distinguishable.  That case involved the avoidance of a preference under Section 547(b)(1) of the Bankruptcy Code. The Eleventh Circuit held that a transfer of a certificate of deposit, although made to a third-party bank, was for the benefit of a lender under Section 547(b)(1) of the Bankruptcy Code because the transfer indirectly secured payment of an under-secured antecedent debt owed to the lender. *Air Conditioning,* 845 F.2d at 296.  As in *TOUSA*, there is no similar web of relationships here.

[11]     In further support of her argument that Section 550(a)'s benefitting-entity category is not limited to guarantors, the Trustee cites two other out-of-circuit decisions that were not presented to the bankruptcy court below.  Both are distinguishable.  *Terry v. Meredith* involved an attempt to hold an accounting practice's president and sole shareholder personally liable as the "entity for whose benefit" a transfer of the accounting practice was made.  527 F.3d 372, 375–76 (4th Cir. 2008).  Colony and LOC I were arms'-length parties who shared no such relationship at the time of the challenged transfers, and in any event, the Fourth Circuit ultimately found insufficient evidence of "benefit" to support liability.  *Id.* at 377.  *In re Compton Corp.* involved a similar fact pattern to the Eleventh Circuit's *Air Conditioning* case, in which a letter of credit was issued in favor of a creditor in order to help secure a previously unsecured debt.  831 F.2d 586, 589–91 (5th Cir. 1987).  The Fifth Circuit held that this creditor was the "entity for whose benefit [the] transfer was made" even though it received no actual transfer from the debtor.  *Id.* at 595. In contrast, the transfer of real property in this case was not made to secure an antecedent debt owed to Colony, and Colony received no analogous benefit in the form of additional security to satisfy this debt.

from the Transferring Debtors to LOC I and—under this circuit's controlling caselaw—a "transferee cannot be the 'entity for whose benefit' the initial transfer was made." *Bonded*, 838 F.2d at 895.[12]

Adhering to this general principle, the bankruptcy court effectively concluded that Colony is not a benefiting entity because it did not receive "essentially what the initial transferee got" and received "no direct benefit from the [initial] transfers." *In re Mack*, 2021 WL 6015700, at *8. The Trustee characterizes this as an unsupported standard. This court disagrees. True, the specific language does not appear in the *Bonded* decision, but the standard articulated by the bankruptcy court finds ample support in other caselaw. *See, e.g.*, *In re Peregrine Fin. Grp., Inc.*, 589 B.R. 360, 380 (Bankr. N.D. Ill. 2018) ("The entity must benefit from the transfer *directly*, not indirectly, as soon as the transfer is made.") (emphasis added); *see also In re Imageset, Inc.*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) ("The benefit must derive *directly* from the transfer, not from the use to which it is put by the transferee.") (emphasis added). And *Bonded* does support the idea that a benefit under 550(a)(1) must be "direct" insofar as it must occur at the time of the initial transfer and not at a later point. 838 F.2d at 896 ("Somone who receives the money later on is not an entity for whose benefit such transfer was made."). Other bankruptcy courts have also held that to hold a purportedly benefiting entity liable for an avoided transfer, there must be a showing that the benefit corresponds to or is commensurate with the value of this transfer. *See, e.g.*, *In re Gordos Rest. Corp.*, 643 B.R. 1, 35 (Bankr. S.D.N.Y. 2022) ("In order to establish liability for a transferee for whose benefit the transfer was made, the benefit must be *direct*, ascertainable and quantifiable and must *correspond to, or be commensurate with*, the value of the property that was transferred. Incidental, unquantifiable, or remote allegations of benefit are not sufficient.")

---

[12]     To the extent that the Trustee believes that Colony benefited because it eventually was able to liquidate the property and pay off its debt downstream from the initial transfer, the court notes simply that "someone who receives the money *later on* is not an entity for whose benefit such transfer was made; only a person who receives a benefit *from* the initial transfer is within this language." *Bonded*, 838 F.2d at 896 (emphasis added).

(emphasis added) (citation omitted). This makes sense: residual or minor benefits should not render a party liable for the value of a transfer that is incommensurate with the value they have received.

The bankruptcy court correctly dismissed the Trustee's claim to hold Colony liable for any avoided fraudulent transfer as an entity for whose benefit such transfer was made.

**V.     The bankruptcy court properly dismissed the Trustee's claim to recover fraudulent transfers from Colony as a subsequent transferee.**

That leaves the Trustee's argument that if Colony is not liable under Section 550(a)(1) of the Bankruptcy Code as a benefiting entity, then it is liable as a subsequent transferee under Section 550(a)(2). (Trustee's Brief at 34–35.) She contends that the bankruptcy court erred when it concluded she had not alleged any basis for liability under this theory.[13] (*Id.*)

In the Trustee's view, the bankruptcy court made inconsistent rulings when it held, on the one hand, that Colony could not be a benefiting entity because it was a subsequent transferee of the liens and, on the other, that the Trustee failed to state a claim to recover from Colony as a subsequent transferee. (Trustee's Brief at 34-35.) Admittedly, there is some confusion in the record in this regard. Both the Defendants and the bankruptcy court have asserted that Colony cannot be a benefiting entity under 550(a)(1) because it is a subsequent transferee of the liens and also that Colony cannot be found liable as a subsequent transferee under Section 550(a)(2). *See In re Mack*, 2021 WL 6015700, at *8–9; (Defendants' Brief at 24-27.)

As the court understands the confusion, it stems from the fact that there are not one, but two "transfers" at issue here—the transfer of real property from the Transferring Debtors to LOC I, and LOC I's subsequent transfer of an interest in this property in the form of a lien to Colony.

---

[13]     The Defendants appear to argue in their brief that the Trustee was required to provide a separate count under Section 550(a)(2) to recover from Colony as a subsequent transferee. (Defendant's Brief at 25.) That objection is overruled. The Trustee was not obligated to provide a separate count in her complaint to seek relief under 550(a)(2). *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories"). In fact, the Trustee always invoked 550(a) in general in her complaint, of which 550(a)(2) is a subset.

Reference to the Seventh Circuit's opinion in *Bonded* and to the text of Section 550(a) of the Bankruptcy Code helps to clear things up. As explained in *Bonded*, a transferee is someone who has "dominion over the money or other asset, the right to put the money to one's own purposes." 838 F.2d at 893. The *Bonded* court also clarified that this "dominion" inquiry "governs the question whether entities are subsequent transferees, too." *Id.* at 896. Therefore, a subsequent transferee is someone who obtains "dominion over the money or other asset" after the initial transferee.

Section 550(a) authorizes a trustee to recover property or the value of transferred property only "to the extent that a *transfer* is avoided . . . ." 11 U.S.C. § 550(a) (emphasis added). Accordingly, the question of what value can be recovered under Section 550(a) depends on *which* transfer is avoided. Had LOC I transferred property to Colony, Colony would be a subsequent transferee of that property as it would have "dominion" via title. But in the circumstances of this case, Colony never obtained title to or equity in the property. It only received a lien. True, the creation of a lien is—as noted—a "transfer" under Section 101(54) of the Bankruptcy Code, but trustees seeking to recover the value of liens under Section 550(a) must avoid the transfer of these liens under one of the avoidance sections listed in Section 550(a). *See, e.g.*, *TOUSA*, 680 F.3d at 1308 (where the transfers of liens made by the debtor-subsidiaries for the benefit of the pre-petition lenders were avoided as constructively fraudulent); *In re Sentinel*, 728 F.3d at 666 (where the trustee sought to avoid the transfer of liens made by the debtor to the bank lender as actually fraudulent).

While the Trustee has stated a claim to avoid the transfers of the *real property* from the Transferring Debtors to LOC I, the Trustee has not alleged facts to avoid and recover the transfers of *liens* by LOC I to Colony. As the bankruptcy court noted, the Trustee's complaint never sought to avoid the transfer of these liens as actually or constructively fraudulent under Section 548, presumably because they were exchanged for loan funds on a dollar-for-dollar basis. *Peterson*, 634 B.R. at 1019; *In re Mack*, 2021 WL 6015700, at *9. Rather, the Trustee only seeks to recover what she describes as the value of the "equity" in the property, approximately $12 million. (SAC

¶ 1.)  But the Trustee never alleges that Colony at any point had sufficient dominion over the property transferred by the Transferring Debtors to LOC I, or the ability to put that property to its own use, to make it a transferee under *Bonded*.  Nor has the Trustee alleged that LOC I transferred to Colony any property it had received from the Transferring Debtors; as the Trustee herself alleges, title remained with LOC I.  The subsequent transferee for title to this property would arguably be the third-party buyers who bought the property from LOC I between May and December of 2017.

As the Trustee's complaint does not state a claim against the Defendants under Section 550(a)(2) of the Bankruptcy Code, the bankruptcy court was correct in concluding that the Trustee failed to allege that Colony is liable as a subsequent transferee of the properties.

## **CONCLUSION**

For the reasons stated above, the judgment of the bankruptcy court is AFFIRMED.

ENTER:

Dated:  March 7, 2024

_____
REBECCA R. PALLMEYER
United States District Judge